IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br>Department of Justice, Antitrust Division,<br>325 7th Street, N.W.; Suite 300<br>Washington, DC 20530,<br><br>      Plaintiff,<br><br>   v.<br><br>THE McCLATCHY COMPANY<br>2100 Q Street<br>Sacramento, CA 95816,<br><br>and<br><br>KNIGHT-RIDDER, INCORPORATED<br>50 West San Fernando Street<br>San Jose, CA 95113,<br><br>      Defendants. | Civil No.:<br>Judge:<br>Filing Date:   June 27, 2006 |

## COMPLAINT

The United States of America, acting under the direction of the Attorney General of the United States, brings this civil antitrust action to prevent the proposed merger of The McClatchy Company and Knight-Ridder, Incorporated. These two newspaper publishing companies are each other's primary competitor in the sale of local daily newspapers to readers in the Minneapolis/St. Paul metropolitan area in the state of Minnesota, and in the sale of advertising in such newspapers. The merger would substantially lessen competition and tend to create a

1

monopoly in the publishing and distribution of newspapers in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

## I. JURISDICTION AND VENUE

1.     This action is filed by the United States pursuant to Section 15 of the Clayton Act, as amended, 15 U.S.C. § 25, to obtain equitable relief to prevent a violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.

2.     Both defendants sell newspapers and sell advertising in such newspapers, a commercial activity that substantially affects and is in the flow of interstate commerce. The Court has jurisdiction over the subject matter of this action and jurisdiction over the parties pursuant to 15 U.S.C. §§ 22, 25, and 26, and 28 U.S.C. §§ 1331 and 1337.

3.     Both defendants conduct business in the District of Columbia and have consented to the plaintiff's assertion that venue in this District is proper under 15 U.S.C. § 22 and 28 U.S.C. §§ 1391(c).

## II. DEFENDANTS AND THE PROPOSED MERGER

4.     Defendant The McClatchy Company ("McClatchy") is a Delaware corporation with its headquarters in Sacramento, California. McClatchy publishes twelve (12) daily newspapers throughout the United States. In the Minneapolis/St. Paul metropolitan area, McClatchy owns and operates the *Star Tribune*.

5.     Defendant Knight-Ridder, Incorporated ("Knight-Ridder") is a Florida corporation with its headquarters in San Jose, California. Knight-Ridder publishes thirty-two (32) daily newspapers throughout the United States. In the Minneapolis/St. Paul metropolitan area, Knight-Ridder owns and operates the *St. Paul Pioneer Press*.

6. On March 12, 2006, McClatchy and Knight-Ridder entered into an "Agreement and Plan of Merger between The McClatchy Company and Knight-Ridder, Inc." ("Merger Agreement"). Pursuant to that agreement, (1) Knight-Ridder would merge with and into McClatchy; (2) Knight-Ridder would cease to exist as a separate corporate entity; and (3) McClatchy would continue to operate as the sole surviving company. As consideration for the merger, each share of Knight-Ridder common stock would be exchanged for cash and stock, for an aggregate transaction value in excess of $4 billion.

7. The merger would combine under common ownership and control the only two local daily newspapers serving the Minneapolis/St. Paul metropolitan area with any significant circulation, the *Star Tribune* and the *St. Paul Pioneer Press*.

8. The combination of these two daily newspapers would substantially reduce or eliminate competition for the sale of local daily newspapers in the Minneapolis/St. Paul metropolitan area and would likely result in higher prices and lower levels of quality and service.

9. In addition, the combination of these two daily newspapers would substantially reduce or eliminate competition for the sale of advertising in local daily newspapers in the Minneapolis/St. Paul metropolitan area and advertisers would likely pay higher prices and receive lower levels of quality and service for their advertisements.

### III. RELEVANT MARKET

*A. Product Market*

10. Local daily newspapers, such as the *Star Tribune* and the *St. Paul Pioneer Press*, provide a unique package of services to their readers. They provide national, state, and local news in a timely manner. The news stories featured in the *Star Tribune* and the *St. Paul Pioneer*

3

*Press* are detailed, as compared to the news as reported by radio or television, and cover a wide range of stories of interest to local readers in the Minneapolis/St. Paul metropolitan area, not just major news highlights. Newspapers, such as the *Star Tribune* and the *St. Paul Pioneer Press*, are portable and allow the reader to read the news, advertisements, and other information at his or her own convenience. Readers also value other features of the *Star Tribune* and the *St. Paul Pioneer Press*, such as calendars of local events and meetings, movie and TV listings, classified advertisements, commercial advertisements, legal notices, comics, syndicated columns, and obituaries. Readers of the *Star Tribune* and the *St. Paul Pioneer Press* do not consider weekly newspapers, radio news, television news, or Internet news to be adequate substitutes for local daily newspapers serving the Minneapolis/St. Paul metropolitan area. If the merged firm were to impose a small but significant and nontransitory increase in the price of local daily newspapers, it would lose too few sales to make the price increase unprofitable.

11. A newspaper's ability to attract readers and build its circulation is not only critical to competition for readers; it also directly affects its ability to compete for advertisers. A newspaper that has more readers is more attractive and more valuable to advertisers. Thus, one important reason that the *Star Tribune* and the *St. Paul Pioneer Press* compete for readers is so that they can better compete for advertisers.

12. Advertising in the *Star Tribune* and the *St. Paul Pioneer Press* allows advertisers to reach a broad cross-section of consumers in the Minneapolis/St. Paul metropolitan area with a detailed message in a timely manner. A substantial portion of the defendants' advertisers do not consider other types of advertising, such as advertising in weekly newspapers, on radio, on television, or on the Internet as adequate substitutes for advertising in a local daily newspaper. In

the Minneapolis/St. Paul metropolitan area, the *Star Tribune* and the *St. Paul Pioneer Press* provide advertisers the best vehicle to advertise the price of their goods or services in a timely manner. If the merged firm were to impose a small but significant and nontransitory increase in the price of advertising in local daily newspapers, it would lose too few sales to make the price increase unprofitable.

13. Accordingly, the sale of local daily newspapers to readers and the sale of access to those readers to advertisers in those newspapers each constitutes a line of commerce, or a relevant product market, within the meaning of Section 7 of the Clayton Act.

*B. Geographic Market*

14. The *Star Tribune* and the *St. Paul Pioneer Press* are both produced, published, and distributed in the Minneapolis/St. Paul metropolitan area.

15. The *Star Tribune* and the *St. Paul Pioneer Press* target readers in the Minneapolis/St. Paul metropolitan area. Both papers provide news relating to the Minneapolis/St. Paul metropolitan area in addition to state and national news. Together, the *Star Tribune* and the *St. Paul Pioneer Press* generate approximately 80 percent of their total circulation from the Minneapolis/St. Paul metropolitan area.

16. Local daily newspapers that serve areas outside of the Minneapolis/St. Paul metropolitan area do not provide local news specific to the Minneapolis/St. Paul metropolitan area. From a readers's standpoint, local daily newspapers serving areas outside of the Minneapolis/St. Paul metropolitan area are not acceptable substitutes for the *Star Tribune* and the *St. Paul Pioneer Press*. If the merged firm were to impose a small but significant and nontransitory increase in the price of local daily newspapers serving the Minneapolis/St. Paul

5

metropolitan area, it would lose too few sales to make the price increase unprofitable.

17. The *Star Tribune* and the *St. Paul Pioneer Press* allow advertisers to target readers in the Minneapolis/St. Paul metropolitan area. From the standpoint of an advertiser selling goods or services in the Minneapolis/St. Paul metropolitan area, advertising in local daily newspapers serving areas outside of the Minneapolis/St. Paul metropolitan area is not an acceptable substitute for advertising in the *Star Tribune* and the *St. Paul Pioneer Press*. If the merged firm were to impose a small but significant and nontransitory increase in the price of advertisements in local daily newspapers serving the Minneapolis/St. Paul metropolitan area, it would lose too few sales to make the price increase unprofitable.

18. Accordingly, the Minneapolis/St. Paul metropolitan area in the state of Minnesota is a section of the country, or a relevant geographic market, within the meaning of Section 7 of the Clayton Act.

## IV. COMPETITIVE EFFECTS

*A. Harm to Readers*

19. The *Star Tribune* and the *St. Paul Pioneer Press* are each other's primary competitor in the sale of local daily newspapers in the Minneapolis/St. Paul metropolitan area, competing aggressively for readers. Their head-to-head competition has given readers in the Minneapolis/St. Paul metropolitan area higher quality news coverage, better service, and lower prices. A combination of these two newspapers under common ownership and control would substantially reduce or eliminate that competition and would decrease incentives of the merged firm to maintain high levels of quality and service.

20. The proposed merger would give the newly merged entity almost 100 percent of

local daily newspaper circulation in the Minneapolis/St. Paul metropolitan area. Based on audited figures for daily circulation ending March 2004, the *Star Tribune* had a daily circulation of 296,069 or approximately 64 percent of readers, and the *St. Paul Pioneer Press* had a daily circulation of 159,223, or approximately 34 percent of readers, in the Minneapolis/St. Paul metropolitan area. Based on audited figures for Sunday circulation ending March 2004, the *Star Tribune* had a Sunday circulation of 517,685, or approximately 72 percent of readers, and the *St. Paul Pioneer Press* had a daily circulation of 203,471, or approximately 28 percent of readers, in the Minneapolis/St. Paul metropolitan area.

21. The only other local daily newspaper competitor of the merged firm in the Minneapolis/St. Paul metropolitan area is the *Stillwater Gazette* with a daily circulation (excluding Sunday) of 3,255 in the year ending in March 2004, which represents less than one percent of readers.

22. Using a measure of market concentration called the Herfindahl-Hirschman Index ("HHI"), explained in Appendix A, the combination of the *Star Tribune* and the *St. Paul Pioneer Press* under common ownership and control would create a monopoly and yield a post-merger HHI of approximately 9,900, representing an increase of roughly 4,488 points for daily circulation. For Sunday circulation, the combination of the *Star Tribune* and the *St. Paul Pioneer Press* would yield an HHI of approximately 10,000, an increase of roughly 4,050 points.

### B. Harm to Advertisers

23. The *Star Tribune* and the *St. Paul Pioneer Press* are each other's primary competitor in the sale of advertising in local daily newspapers in the Minneapolis/St. Paul metropolitan area, competing aggressively for the business of advertisers in that area. Their

head-to-head competition has been instrumental in giving advertisers in the Minneapolis/St. Paul metropolitan area higher quality advertising, better service, and lower prices. A combination of these two newspapers under common ownership and control would substantially reduce or eliminate that competition.

24.     If the two papers combine under common ownership and control, the combined entity would control virtually 100 percent of the sales of advertisements in local daily newspapers serving the Minneapolis/St. Paul metropolitan area. In 2005, the *Star Tribune* generated $308 million, or approximately 68 percent, in total daily newspaper advertising revenues. The *St. Paul Pioneer Press* generated $140 million, or approximately 32 percent, in total daily newspaper advertising revenues. The vast majority of these advertising revenues come from advertisers seeking to reach readers in the Minneapolis/St. Paul metropolitan area.

## V. ENTRY

25.     Entry by local daily newspapers in the Minneapolis/St. Paul metropolitan area is time-consuming and difficult, and is not likely to eliminate the anticompetitive effects of the merger by constraining the market power of the combined entity in the near-term, or in the foreseeable future. Local daily newspapers incur significant fixed costs, many of which are sunk. Examples of these sunk costs include hiring reporters and editors, news gathering, and marketing the very existence of the new paper, all of which take substantial time. In the event that the entrant fails or exits the newspaper industry, it cannot recover these sunk costs, making entry risky and likely unprofitable. As a result, entry will not be timely, likely, or sufficient to eliminate the competitive harm that would likely result from the proposed merger.

## VI. VIOLATION ALLEGED

26. On March 12, 2006, McClatchy and Knight-Ridder entered into the Merger Agreement. Pursuant to that agreement, Knight-Ridder would merge with and into McClatchy. As a result of this transaction, the *Star Tribune* and the *St. Paul Pioneer Press* would be under common ownership and control.

27. This transaction will have the following effects, among others, in violation of Section 7 of the Clayton Act, 15 U.S.C. 18:

    (a) competition in the sale of local daily newspapers to readers in the Minneapolis/St. Paul metropolitan area will be substantially lessened or eliminated;

    (b) prices for local daily newspapers in the Minneapolis/St. Paul metropolitan area would likely increase to levels above those that would prevail absent the merger;

    (c) competition in the sale of advertising in local daily newspapers in the Minneapolis/St. Paul metropolitan area will be substantially lessened or eliminated; and

    (d) prices for advertising in local daily newspapers in the Minneapolis/St. Paul metropolitan area would likely increase to levels above those that would prevail absent the merger.

## VII. REQUESTED RELIEF

28. Plaintiff requests:

    (a)  adjudication that the proposed merger of McClatchy and Knight-Ridder violates Section 7 of the Clayton Act;

    (b)  permanent injunctive relief to prevent the consummation of the proposed merger and to prevent the defendants from entering into or carrying out any agreement, understanding or plan, the effect of which would be to combine the businesses or assets of defendants;

    (c)  an award to plaintiff of its costs in this action; and

    (d)  such other relief as is proper.

/
/
/
/
/
/
/
/
/
/
/
/
/
/
/
/
/
/

DATED: June 27, 2006

FOR PLAINTIFF UNITED STATES OF AMERICA

_____
THOMAS O. BARNETT
Assistant Attorney General
Antitrust Division

_____
DAVID L. MEYER
Deputy Assistant Attorney General
Antitrust Division

_____
J. ROBERT KRAMER II
Director of Operations

_____
JOHN R. READ
Chief, Litigation III

_____
GREGG I. MALAWER (D.C. Bar #481685)
JOAN HOGAN
Attorneys for the United States
United States Department of Justice
Antitrust Division, Litigation III
325 7th Street, N.W., Suite 300
Washington, DC 20530
(202) 514-2000

## EXHIBIT A
## DEFINITION OF HHI AND
## CALCULATIONS FOR MARKET

"HHI" means the Herfindahl-Hirschman Index, a commonly accepted measure of market concentration. It is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers. For example, for a market consisting of four firms with shares of thirty, thirty, twenty and twenty percent, the HHI is 2600 ($30^2 + 30^2 + 20^2 + 20^2 = 2600$). The HHI takes into account the relative size and distribution of the firms in a market and approaches zero when a market consists of a large number of firms of relatively equal size. The HHI increases both as the number of firms in the market decreases and as the disparity in size between those firms increases.

Markets in which the HHI is between 1000 and 1800 points are considered to be moderately concentrated, and those in which the HHI is in excess of 1800 points are considered to be concentrated. Transactions that increase the HHI by more than 100 points in concentrated markets presumptively raise antitrust concerns under the Merger Guidelines. See *Merger Guidelines* § 1.51.