**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | Civil No.: |
| ) | |
| v. ) | Judge: |
| ) | |
| THE McCLATCHY COMPANY ) | Filing Date: June 27, 2006 |
| ) | |
| and ) | |
| ) | |
| KNIGHT-RIDDER, INCORPORATED, ) | |
| ) | |
| Defendants. ) | |

**COMPETITIVE IMPACT STATEMENT**

Plaintiff, the United States of America ("United States" or "Plaintiff" or "government"),

pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act ("APPA"), 15 U.S.C. §

16(b)-(h), files this Competitive Impact Statement relating to the proposed Final Judgment

submitted for entry in this civil antitrust proceeding.

I. **NATURE AND PURPOSE OF THE PROCEEDING**

Plaintiff the United States filed a civil antitrust Complaint on June 26, 2006, alleging that

a proposed merger of The McClatchy Company ("McClatchy") and Knight-Ridder, Incorporated

("Knight-Ridder") would violate Section 7 of the Clayton Act, 15 U.S.C. § 18. The Complaint

alleges that McClatchy and Knight-Ridder are each other's primary competitor in the sale of

local daily newspapers to readers in the Minneapolis/St. Paul metropolitan area in the state of

1

Minnesota and in the sale of advertising in such newspapers.  The merger would combine under

common ownership and control the only two local daily newspapers serving the Minneapolis/St.

Paul metropolitan area, the *Star Tribune* and the *St. Paul Pioneer Press*.  The newly merged firm

would have essentially a 100 percent market share (by circulation and revenue).  As a result, the

combination of these two daily newspapers would substantially reduce or eliminate competition

for readers of local daily newspapers and newspaper readers in the Minneapolis/St. Paul

metropolitan area would be likely to pay higher prices and to receive lower levels of quality and

service.  In addition, the combination of these two daily newspapers would substantially reduce

or eliminate competition for advertising in local daily newspapers in the Minneapolis/St. Paul

metropolitan area and advertisers would be likely to pay higher prices and to receive lower levels

of quality and service for their advertisements.

The prayer for relief seeks: (a) an adjudication that the proposed merger described in the

Complaint would violate Section 7 of the Clayton Act; (b) permanent injunctive relief preventing

the consummation of the transaction; (c) an award to the plaintiff of the costs of this action; and

(d) such other relief as is proper.

Shortly before this suit was filed, a proposed settlement was reached that permits

McClatchy to complete its merger with Knight-Ridder, yet preserves competition in the markets

in which the transaction would raise significant competitive concerns.  A Stipulation and

proposed Final Judgment embodying the settlement were filed at the same time the Complaint

was filed.

The proposed Final Judgment, which is explained more fully below, requires McClatchy

and Knight-Ridder to divest the *St. Paul Pioneer Press* to acquirer(s) acceptable to the United States. Unless the United States grants a time extension, the divestiture must be completed within sixty (60) calendar days after the filing of the Complaint in this matter or five (5) calender days after notice of the entry of this Final Judgment by the Court, whichever is later.

If the divestitures are not completed within the divestiture period, the Court, upon application of the United States, is to appoint a trustee selected by the United States to sell the assets. The proposed Final Judgment also requires that, until the divestitures mandated by the Final Judgment have been accomplished, the defendants must maintain and operate the *St. Paul Pioneer Press* as an active competitor, maintain the management, staffing, sales, and marketing of the *St. Paul Pioneer Press* and fully maintain the *St. Paul Pioneer Press* in operable condition.

The plaintiff and the defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA. Entry of the proposed Final Judgment would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof.

## II. **THE ALLEGED VIOLATION**

### A. **The Defendants**

McClatchy is a Delaware corporation with its headquarters in Sacramento, California. McClatchy publishes twelve (12) daily newspapers throughout the United States. In the Minneapolis/St. Paul metropolitan area, McClatchy owns and operates the *Star Tribune*. McClatchy had revenues of approximately $1.2 billion during 2005.

Knight-Ridder is a Florida corporation with its headquarters in San Jose, California. Knight-Ridder publishes thirty-two (32) daily newspapers throughout the United States. In the

3

Minneapolis/St. Paul metropolitan area, Knight-Ridder owns and operates the *St. Paul Pioneer Press*. Knight-Ridder had revenues of approximately $3 billion during 2005.

## B. **Description of the Events Giving Rise to the Alleged Violation**

On March 12, 2006, McClatchy and Knight-Ridder entered into an "Agreement and Plan of Merger between The McClatchy Company and Knight-Ridder, Inc." ("Merger Agreement"). Pursuant to that agreement, (1) Knight-Ridder would merge with and into McClatchy; (2) Knight-Ridder would cease to exist as a separate corporate entity; and (3) McClatchy would continue to operate as the sole surviving company. As consideration for the merger, each share of Knight-Ridder common stock would be exchanged for cash and stock, for an aggregate transaction value in excess of $4 billion.

The *Star Tribune* and the *St. Paul Pioneer Press* compete head-to-head in the sale of local daily newspapers in the Minneapolis/St. Paul metropolitan area and compete head-to-head in the sale of advertising in these local daily newspapers. They compete for readers so that they can better compete for advertisers. The proposed merger, and the threatened loss of competition that would be caused by it, precipitated the government's suit.

## C. **Anticompetitive Consequences of the Proposed Transaction**

1. Relevant Market

   *A. Product Market*

The Complaint alleges that the sale of local daily newspapers to readers and the sale of access to those readers to advertisers in such newspapers each constitutes a line of commerce within the meaning of Section 7 of the Clayton Act. From a reader's standpoint, the news stories

4

in local daily newspapers, such as the *Star Tribune* and the *St. Paul Pioneer Press*, differ

significantly from other sources of news. The news stories are detailed, as compared to the news

as reported by radio or television, and the *Star Tribune* and the *St. Paul Pioneer Press* cover a

wide range of stories of interest to local readers, not just major news highlights. Newspapers,

such as the *Star Tribune* and the *St. Paul Pioneer Press*, are portable and allow the reader to read

the news, advertisements, and other information at his or her own convenience. Readers also

value other features of the *Star Tribune* and the *St. Paul Pioneer Press*, such as calendars of local

events and meetings, movie and TV listings, classified advertisements, commercial

advertisements, legal notices, comics, syndicated columns, and obituaries. Readers of the *Star

Tribune* and the *St. Paul Pioneer Press* do not consider weekly newspapers, radio news,

television news, or Internet news to be adequate substitutes for local daily newspapers. If the

merged firm were to impose a small but significant and nontransitory increase in the price of

advertisements in local daily newspapers, it would lose too few sales to make the price increase

unprofitable.

      From an advertiser's standpoint, there is no alternative to purchasing advertisements from

local daily papers. Advertising in the *Star Tribune* and the *St. Paul Pioneer Press* allows

advertisers to reach a broad cross-section of consumers in the Minneapolis/St. Paul metropolitan

area with a detailed message in a timely manner. A substantial portion of defendants' advertisers

do not consider other types of advertising, such as advertising in weekly newspapers, on radio, on

television, or on the Internet as adequate substitutes for advertising in a local daily newspaper. In

the Minneapolis/St. Paul metropolitan area, the *Star Tribune* and the *St. Paul Pioneer Press*

provide advertisers the best vehicle to advertise the price of their goods or services in a timely

manner.  If the merged firm were to impose a small but significant and nontransitory increase in the price of advertising in local daily newspapers, it would lose too few sales to make the price increase unprofitable.

### B.  Geographic Market

The Complaint alleges that the Minneapolis/St. Paul metropolitan area in the state of Minnesota is a section of the country, or a relevant geographic market, within the meaning of Section 7 of the Clayton Act.  The *Star Tribune* and the *St. Paul Pioneer Press* are both produced, published, and distributed in the Minneapolis/St. Paul metropolitan area.  The *Star Tribune* and the *St. Paul Pioneer Press* target readers in the Minneapolis/St. Paul metropolitan area.  Both papers provide news relating to the Minneapolis/St. Paul metropolitan area in addition to state and national news.  Together, the *Star Tribune* and the *St. Paul Pioneer Press* generate approximately 80 percent of their total circulation from the Minneapolis/St. Paul metropolitan area.

Local daily newspapers that serve areas outside of the Minneapolis/St. Paul metropolitan area do not provide local news specific to the Minneapolis/St. Paul metropolitan area.  From a readers's standpoint, local daily newspapers serving areas outside of the Minneapolis/St. Paul metropolitan area are not acceptable substitutes for the *Star Tribune* and the *St. Paul Pioneer Press*.  If the merged firm were to impose a small but significant and nontransitory increase in the price of local daily newspapers serving the Minneapolis/St. Paul metropolitan area, it would lose too few sales to make the price increase unprofitable

From the standpoint of an advertiser selling goods or services in the Minneapolis/St. Paul metropolitan area, advertising in local daily newspapers serving areas outside of the

6

Minneapolis/St. Paul metropolitan area are not acceptable substitutes for the *Star Tribune* and the *St. Paul Pioneer Press*. If the merged firm were to impose a small but significant and nontransitory increase in the price of local daily newspapers serving the Minneapolis/St. Paul metropolitan area, it would lose too few sales to make the price increase unprofitable.

2. Competitive Effects

   *A. Harm to Readers*

The Complaint alleges that, in the Minneapolis/St. Paul metropolitan area, the merger of McClatchy and Knight-Ridder would lessen competition substantially and tend to create a monopoly in market for local daily newspapers. The *Star Tribune* and the *St. Paul Pioneer Press* are each other's primary competitor in the sale of local daily newspapers in the Minneapolis/St. Paul metropolitan area, competing aggressively for readers. Their head-to-head competition has given readers in the Minneapolis/St. Paul metropolitan area higher quality news coverage, better service, and lower prices. A combination of these two newspapers under common ownership and control would substantially reduce or eliminate that competition and would decrease incentives of the merged firm to maintain high levels of quality and service.

The proposed transaction would create further market concentration in an already concentrated market for local daily newspapers. The merged firm would control the only two daily local newspapers in the Minneapolis/St. Paul metropolitan area, the *Star Tribune* and the *St. Paul Pioneer Press*, with a market share position of almost 100 percent, as measured by local daily newspaper circulation. Prior to the merger, the *Star Tribune* had the highest market share in the Minneapolis/St. Paul metropolitan area, with approximately 72 percent of readers. The only other local daily newspaper competitor of the merged firm in the Minneapolis/St. Paul

7

metropolitan area, the *Stillwater Gazette*, had a market share of less than one percent of readers.
According to the Herfindahl-Hirschman Index ("HHI"), a widely-used measure of market
concentration defined and explained in Exhibit A, the combination of the *Star Tribune* and the
*St. Paul Pioneer Press* under common ownership and control would create a monopoly and yield
a post-merger HHI of approximately 9,900, representing an increase of roughly 4,488 points for
daily circulation.  For Sunday circulation, the combination of the *Star Tribune* and the *St. Paul
Pioneer Press* would yield an HHI of approximately 10,000, an increase of roughly 4,050 points.

### B. Harm to Advertisers

The Complaint also alleges that, in the Minneapolis/St. Paul metropolitan area, the
merger of McClatchy and Knight-Ridder would lessen competition substantially and tend to
create a monopoly in the market for advertising in local daily newspapers.  The *Star Tribune* and
the *St. Paul Pioneer Press* are each other's primary competitor in the sale of advertising in local
daily newspapers in the Minneapolis/St. Paul metropolitan area, competing aggressively for the
business of advertisers in that area.  Their head-to-head competition has been instrumental in
giving advertisers in the Minneapolis/St. Paul metropolitan area higher quality advertising, better
service, and lower prices.  A combination of these two newspapers under common ownership
and control would substantially reduce or eliminate that competition.

The proposed transaction would create further market concentration in an already
concentrated market for advertising in local daily newspapers.  If the two papers combine under
common ownership and control, the combined entity would control virtually 100 percent of the
sales of advertisements in local daily newspapers serving the Minneapolis/St. Paul metropolitan
area.  Prior to the merger, the *Star Tribune* generated $308 million, or approximately 68 percent,

in total local daily newspaper advertising revenues. The *St. Paul Pioneer Press* generated $140

million, or approximately 32 percent, in total local daily newspaper advertising revenues. The

vast majority of these advertising revenues come from advertisers seeking to reach readers in the

Minneapolis/St. Paul metropolitan area.

The proposed Final Judgment would leave the merged firm in control of the *Star Tribune*,

but not the *St. Paul Pioneer Press*. As a result, readers will not be harmed as the separate owners

of the *Star Tribune* and the *St. Paul Pioneer Press* will still have an economic incentive to

compete against each other and capture the other company's readers by offering lower prices and

a better product. In addition, advertisers will not be harmed as the separate owners of the *Star

Tribune* and the *St. Paul Pioneer Press* will still have an economic incentive to compete against

each other for additional advertising dollars by offering lower rates, discounts off the rate cards,

and better service. The proposed Final Judgment will preserve the premerger competitive

situation in which readers and advertisers have two local daily newspapers in the Minneapolis/St.

Paul metropolitan area from which to choose.

    3. <u>Entry</u>

Entry by local daily newspapers in the Minneapolis/St. Paul metropolitan area is time-

consuming and difficult, and is not likely to eliminate the anticompetitive effects of the merger

by constraining the market power of the combined entity in the near-term, or in the foreseeable

future. Local daily newspapers incur significant fixed costs, many of which are sunk. Examples

of these sunk costs include hiring reporters and editors, news gathering, and marketing the very

existence of the new paper, all of which take substantial time. In the event that the entrant fails

or exits the newspaper industry, it cannot recover these sunk costs, making entry risky and likely

unprofitable. As a result, entry will not be timely, likely, or sufficient to eliminate the competitive harm that would likely result from the proposed merger.

    4. <u>Violation Alleged</u>

For all of these reasons, Plaintiff has concluded that the proposed transaction would lessen competition substantially in the sale of local daily newspapers to readers and in the sale of advertising in such newspapers serving the Minneapolis/St. Paul metropolitan area, and likely result in increased prices and lower service and quality for readers and advertisers. The proposed merger therefore violates of Section 7 of the Clayton Act.

### 3. **EXPLANATION OF THE PROPOSED FINAL JUDGMENT**

The proposed Final Judgment would preserve existing competition in the sale of local daily newspapers to readers and in the sale of advertising in such newspapers serving the Minneapolis/St. Paul metropolitan area. It requires the divestiture of the *St. Paul Pioneer Press*. The divestiture will preserve choices for readers and advertisers. The divestiture will make it less likely that in the relevant market (1) prices will increase for readers, (2) prices will increase for advertisers, (3) the quality of the local daily newspapers will decline or (4) service levels will decline as a result of the transaction.

Unless the United States grants an extension of time, the divestiture must be completed within sixty (60) calendar days after the filing of the Complaint in this matter or five (5) calender days after notice of the entry of this Final Judgment by the Court, whichever is later. Until the divestiture takes place, McClatchy must maintain and operate the *St. Paul Pioneer Press* as an active competitor to the *Star Tribune*, maintain the management, staffing, sales, and marketing of the *St. Paul Pioneer Press*, and fully maintain the *St. Paul Pioneer Press* in operable condition.

The divestiture must be to a purchaser or purchasers acceptable to the United States in its sole discretion. Unless the United States otherwise consents in writing, the divestiture shall include all the assets of the *St. Paul Pioneer Press*, and shall be accomplished in such a way as to satisfy the United States that such assets can and will be used as a viable local daily newspaper.

If Defendant McClatchy fails to divest the *St. Paul Pioneer Press* within the time periods specified in the Final Judgment, the Court, upon application of the United States, is to appoint a trustee nominated by the United States to effect the divestitures. If a trustee is appointed, the proposed Final Judgment provides that McClatchy will pay all costs and expenses of the trustee and any professionals and agents retained by the trustee. Under Section V(d) of the proposed Final Judgment, the compensation paid to the trustee and any persons retained by the trustee shall be both reasonable in light of the value of the *St. Paul Pioneer Press*, and based on a fee arrangement providing the trustee with an incentive based on the price and terms of the divestitures and the speed with which they are accomplished. Timeliness is paramount. After appointment, the trustee will file monthly reports with the parties and the Court, setting forth the trustee's efforts to accomplish the divestitures ordered under the proposed Final Judgment. Section V(g) of the proposed Final Judgment provides that if the trustee has not accomplished the divestitures within four (4) months after its appointment, the trustee shall promptly file with the Court a report setting forth (1) the trustee's efforts to accomplish the required divestitures, (2) the reasons, in the trustee's judgment, why the required divestitures have not been accomplished and (3) the trustee's recommendations. At the same time the trustee will furnish such report to the plaintiff and defendants, who will each have the right to be heard and to make additional recommendations.

11

4. **REMEDIES AVAILABLE TO POTENTIAL PRIVATE LITIGANTS**

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees. Entry of the proposed Final Judgment will neither impair nor assist the bringing of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), the proposed Final Judgment has no prima facie effect in any subsequent private lawsuit that may be brought against defendants.

5. **PROCEDURES AVAILABLE FOR MODIFICATION OF THE PROPOSED FINAL JUDGMENT**

Plaintiff and defendants have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that plaintiff has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least sixty (60) days preceding the effective date of the proposed Final Judgment within which any person may submit to plaintiff written comments regarding the proposed Final Judgment. Any person who wishes to comment should do so within sixty (60) days of the date of publication of this Competitive Impact Statement in the Federal Register. All comments received during this period will be considered by the Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time prior to the Court's entry of judgment. The comments and the response of plaintiff will be filed with the Court and published in the Federal Register.

Written comments should be submitted to:

> John R. Read
> Chief, Litigation III
> Antitrust Division
> United States Department of Justice
> 325 7th Street, NW  Suite 300
> Washington, DC 20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

## 6. **ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT**

Plaintiff considered, as an alternative to the proposed Final Judgment, a full trial on the merits against Defendants.  Plaintiff could have continued the litigation and sought preliminary and permanent injunctions against McClatchy's acquisition of Knight-Ridder.  Plaintiff is satisfied, however, that the divestiture of assets and other relief described in the proposed Final Judgment will preserve competition in the sale of local daily newspapers to readers and in the sale of advertising in such newspapers serving the Minneapolis/St. Paul metropolitan area as identified in the Complaint.

## 7. **STANDARD OF REVIEW UNDER THE APPA FOR PROPOSED FINAL JUDGMENT**

The APPA requires that proposed consent judgments in antitrust cases brought by the United States be subject to a sixty (60) day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public interest." In making

that determination, the Court shall consider:

> (A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration or relief sought, anticipated effects of alternative remedies actually considered and any other considerations bearing upon the adequacy of such judgment;

> (B) the impact of entry of such judgment upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B).  As the United States Court of Appeals for the D.C. Circuit held, this statute permits a court to consider, among other things, the relationship between the remedy secured and the specific allegations set forth in the government's complaint, whether the decree is sufficiently clear, whether enforcement mechanisms are sufficient and whether the decree may positively harm third parties. *See United States v. Microsoft*, 56 F.3d 1448, 1461-62 (D.C. Cir. 1995).

"Nothing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2).  Thus, in conducting this inquiry, "[t]he Court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process."[1]  Rather,

[a]bsent a showing of corrupt failure of the government to discharge its duty, the Court, in

---

[1] 119 Cong. Rec. 24598 (1973) (statement of Senator Tunney). *See United States v. Gillette Co.*, 406 F. Supp. 713, 715 (D. Mass. 1975).  A "public interest" determination can be made properly on the basis of the Competitive Impact Statement and Response to Comments filed pursuant to the APPA. Although the APPA authorizes the use of additional procedures, 15 U.S.C. § 16(f), those procedures are discretionary. A court need not invoke any of them unless it believes that the comments have raised significant issues and that further proceedings would aid the court in resolving those issues. *See* H.R. Rep. 93-1463, 93rd Cong. 2d Sess. 8-9 (1974), *reprinted in* U.S.C.C.A.N. 6535, 6538.

14

making its public interest finding, should . . . carefully consider the explanations of the
government in the competitive impact statement and its responses to comments in order
to determine whether those explanations are reasonable under the circumstances.

*United States v. Mid-America Dairymen, Inc.*, 1977-1 Trade Cas. ¶ 61,508, at 71,980 (W.D. Mo.
1977).

Accordingly, with respect to the adequacy of the relief secured by the decree, a court may

not "engage in an unrestricted evaluation of what relief would best serve the public." *United*

*States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988), *citing United States v. Bechtel Corp.*, 648

F.2d 660, 666 (9th Cir.), *cert. denied*, 454 U.S. 1083 (1981); *see also Microsoft*, 56 F.3d at 1460-

62. Precedent requires that:

> the balancing of competing social and political interests affected by a proposed antitrust
> consent decree must be left, in the first instance, to the discretion of the Attorney General.
> The court's role in protecting the public interest is one of insuring that the government has
> not breached its duty to the public in consenting to the decree. The court is required to
> determine not whether a particular decree is the one that will best serve society, but
> whether the settlement is "*within the reaches of the public interest.*" More elaborate
> requirements might undermine the effectiveness of antitrust enforcement by consent
> decree.[2]

*Bechtel*, 648 F.2d at 666 (citations omitted) (emphasis added).

Court approval of a final judgment requires a standard more flexible and less strict than

the standard required for a finding of liability. "[A] proposed decree must be approved even if it

falls short of the remedy the court would impose on its own, as long as it falls within the range of

acceptability or is 'within the reaches of public interest.'" *United States v. American Tel. and*

---

[2] *Cf. BNS*, 858 F.2d at 464; 858 F.2d at 464 (holding that the court's "ultimate authority
under the [APPA] is limited to approving or disapproving the consent decree"); *Gillette*, 406 F.
Supp. at 716 (noting that, in this way, the court is constrained to "look at the overall picture not
hypercritically, nor with a microscope, but with an artist' s reducing glass"); *see generally
Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so
inconsonant with the allegations charged as to fall outside of the 'reaches of the public
interest'").

*Tel. Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982), *aff'd. sub nom. Maryland v. United States*, 460

U.S. 1001 (1983), *quoting Gillette Co.*, 406 F. Supp. at 716 (citations omitted); *United States v.*

*Alcan Aluminum, Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky. 1985). Moreover, the Court's role

under the APPA is limited to reviewing the remedy in relationship to the violations that the

United States has alleged in its Complaint, and does not authorize the Court to "construct [its]

own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at

1459. Because the "court's authority to review the decree depends entirely on the government's

exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the

court is only authorized to review the decree itself," and not to "effectively redraft the complaint"

to inquire into other matters that the United States did not pursue. *Id*. at 1459-60.

VIII. **DETERMINATIVE DOCUMENTS**

There are no determinative materials or documents within the meaning of the APPA that

were considered by the plaintiff in formulating the proposed Final Judgment.

Dated: June 27, 2006

Respectfully submitted,

*Gregg Malawer*

Gregg I. Malawer (D.C. Bar #481685)
U.S. Department of Justice
Antitrust Division
325 7th Street, N.W. Suite 300
Washington, DC 20530
(202) 514-0230
Attorney for Plaintiff the United States

17

**EXHIBIT A**
**DEFINITION OF HHI AND**
**CALCULATIONS FOR MARKET**

"HHI" means the Herfindahl-Hirschman Index, a commonly accepted measure of market concentration. It is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers. For example, for a market consisting of four firms with shares of thirty, thirty, twenty and twenty percent, the HHI is 2600 ($30^2 + 30^2 + 20^2 + 20^2 =$ 2600). The HHI takes into account the relative size and distribution of the firms in a market and approaches zero when a market consists of a large number of firms of relatively equal size. The HHI increases both as the number of firms in the market decreases and as the disparity in size between those firms increases.

Markets in which the HHI is between 1000 and 1800 points are considered to be moderately concentrated, and those in which the HHI is in excess of 1800 points are considered to be concentrated. Transactions that increase the HHI by more than 100 points in concentrated markets presumptively raise antitrust concerns under the Merger Guidelines. See *Merger Guidelines* § 1.51.

18