whether the settlement is "*within the reaches of the public interest.*" More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

Bechtel, 648 F.2d at 666 (emphasis added) (citations omitted).[5]

The proposed Final Judgment, therefore, should not be reviewed under a standard of whether it is certain to eliminate every anticompetitive effect of a particular practice or whether it mandates certainty of free competition in the future. Court approval of a final judgment requires a standard more flexible and less strict than the standard required for a finding of liability. "[A] proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is 'within the reaches of public interest.'" *United States* v. *AT&T*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting *Gillette*, 406 F. Supp. at 716), *aff'd sub nom. Maryland* v. *United States*, 460 U.S. 1001 (1983); *see also United States* v. *Alcan Aluminum Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the consent decree even though the court would have imposed a greater remedy).

Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case." Microsoft, 56 F.3d at 1459. Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Id.* at 1459–60.

### IX. Determinative Documents

There are no determinative materials or documents within the meaning of the APPA that were considered by the United States in formulating the proposed Final Judgment. Dated: June 23, 2006.

Respectfully submitted,
Karen Phillips-Savoy,
Dando Cellini,
Jillian Charles,
James Foster,
Christine Hill,
Tara Shinnick,
Robert Wilder,

---

[5] Cf. BNS, 858 F.2d at 463 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); Gillette, 406 F. Supp. at 716 (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass"). See generally Microsoft, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the "reaches of the public interest").

U.S. Department of Justice, Antitrust Division, Litigation II Section, Washington, DC 20530.

[FR Doc. 06–6361 Filed 7–19–06; 8:45 am]
**BILLING CODE 4410–11–M**

---

## DEPARTMENT OF JUSTICE

### Antitrust Division

### United States v. The McClatchy Company and Knight-Ridder Incorporated; Proposed Final Judgment and Competitive Impact Statement

Notice is hereby given pursuant to the Antitrust Procedures and Penalties Act, 15 U.S.C. 16(b) through (h), that a proposed Final Judgment, Stipulation and Competitive Impact Statement have been filed with the United States District Court for the District of Columbia in *United States of America* v. *The Clatchy Company and Knight-Ridder, Incorporated*, Case No. 1:06CV01175. On June 27, 2006, the United States filed a Complaint alleging that the proposed merger of The McClatchy Company and Knight-Ridder, Incorporated would violate Section 7 of the Clayton Act, 15 U.S.C. 18. The proposed Final Judgment, filed the same time as the Complaint, requires defendant The McClatchy Company to divest the *Pioneer Press*, a daily newspaper distributed in the Minneapolis/St. Paul metropolitan area, along with certain tangible and intangible assets. Copies of the Complaint, proposed Final Judgment and Competitive Impact Statement are available for inspection at the Department of Justice in Washington, DC in Room 215, 325 Seventh Street, NW., and at the Office of the Clerk of the United States District Court for the District of Columbia, Washington, DC.

Public comment is invited within 60 days of the date of this notice. Such comments, and responses thereto, will be published in the **Federal Register** and filed with the Court. Comments should be directed to John R. Read, Chief, Litigation III Section, Antitrust Division, United States Department of Jusstice, 325 7th Street, NW., Suite 300, Washington, DC 20530 (telephone: 202–307–0468).

J. Robert Kramer II,
*Director of Operations, Antitrust Division.*

### In the United States District Court for the District of Columbia

*United States of America, Department of Justice, Antitrust Division, 325 7th Street, NW.; Suite 300, Washington, DC 20530, Plaintiff,* v. *The McClatchy Company, 2100 Q Street, Sacramento, CA 95816, and Knight-Ridder, Incorporated, 50 West San Fernando Street, San Jose, CA 95113, Defendants*

Case Number 1:06CV01175, *Judge:* Richard W. Roberts, *Deck Type:* Antitrust, *Date Stamp:* 06/27/2006.

### Complaint

The United States of America, acting under the direction of the Attorney General of the United States, brings this civil antitrust action to prevent the proposed merger of The McClatchy Company and Knight-Ridder, Incorporated. These two newspaper publishing companies are each other's primary competitor in the sale of local daily newspapers to readers in the Minneapolis/St. Paul metropolitan area in the state of Minnesota, and in the sale of advertising in such newspapers. The merger would substantially lessen competition and tend to create a monopoly in the publishing and distribution of newspapers in violation of Section 7 of the Clayton Act, 15 U.S.C. 18.

### I. Jurisdiction and Venue

1. This action is filed by the United States pursuant to Section 15 of the Clayton Act, as amended, 15 U.S.C. 25, to obtain equitable relief to prevent a violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. 18.

2. Both defendants sell newspapers and sell advertising in such newspapers, a commercial activity that substantially affects and is in the flow of interstate commerce. The Court has jurisdiction over the subject matter of this action and jurisdiction over the parties pursuant to 15 U.S.C. 22, 25, and 26, and 28 U.S.C. 1331 and 1337.

3. Both defendants conduct business in the District of Columbia and have consented to the plaintiff's assertion that venue in this District is proper under 15 U.S.C. 22 and 28 U.S.C. 1391(c).

### II. Defendants and the Proposed Merger

4. Defendant The McClatchy Company ("McClatchy") is a Delaware corporation with its headquarters in Sacramento, California. McClatchy publishes twelve (12) daily newspapers throughout the United States. In the Minneapolis/St. Paul metropolitan area, McClatchy owns and operates the Star Tribune.

5. Defendant Knight-Ridder, Incorporated ("Knight-Ridder") is a Florida corporation With its headquarters in San Jose, California. Knight-Ridder publishes thirty-two (32) daily newspapers throughout the United States. In the Minneapolis/St. Paul metropolitan area, Knight-Ridder owns and operates the St. Paul Pioneer Press.

6. On March 12, 2006, McClatchy and Knight-Ridder entered into an "Agreement

and Plan of Merger between The McClatchy Company and Knight-Ridder, Inc." ("Merger Agreement"). Pursuant to that agreement, (1) Knight-Ridder would merge with and into McClatchy; (2) Knight-Ridder would cease to exist as a separate corporate entity; and (3) McClatchy would continue to operate as the sole surviving company. As consideration for the merger, each share of Knight-Ridder common stock would be exchanged for cash and stock, for an aggregate transaction value in excess of $4 billion.

7. The merger would combine under common ownership and control the only two local daily newspapers serving the Minneapolis/St. Paul metropolitan area with any significant circulation, the Star Tribune and the St. Paul Pioneer Press.

8. The combination of these two daily newspapers would substantially reduce or eliminate competition for the sale of local daily newspapers in the Minneapolis/St. Paul metropolitan area and would likely result in higher prices and lower levels of quality and service.

9. In addition, the combination of these two daily newspapers would substantially reduce or eliminate competition for the sale of advertising in local daily newspapers in the Minneapolis/St. Paul metropolitan area and advertisers would likely pay higher prices and receive lower levels of quality and service for their advertisements.

## III. Relevant Market

### A. Product Market

10. Local daily newspapers, such as the Star Tribune and the St. Paul Pioneer Press, provide a unique package of services to their readers. They provide national, state, and local news in a timely manner. The news stories featured in the Star Tribune and the St. Paul Pioneer Press are detailed, as compared to the news as reported by radio or television, and cover a wide range of stories of interest to local readers in the Minneapolis/St. Paul metropolitan area, not just major news highlights. Newspapers, such as the Star Tribune and the St. Paul Pioneer Press, are portable and allow the reader to read the news, advertisements, and other information at his or her own convenience. Readers also value other features of the Star Tribune and the St. Paul Pioneer Press, such as calendars of local events and meetings, movie and TV listings, classified advertisements, commercial advertisements, legal notices, comics, syndicated columns, and obituaries. Readers of the Star Tribune and the St. Paul Pioneer Press do not consider weekly newspapers, radio news, television news, or Internet news to be adequate substitutes for local daily newspapers serving the Minneapolis/St. Paul metropolitan area. If the merged firm were to impose a small but significant and nontransitory increase in the price of local daily newspapers, it would lose too few sales to make the price increase unprofitable.

11. A newspaper's ability to attract readers and build its circulation is not critical to competition for readers; it also directly affects its ability to compete for advertisers. A newspaper that has more readers is more attractive and more valuable to advertisers. Thus, one important reason that the Star Tribune and the St. Paul Pioneer Press compete for readers is so that they can better compete for advertisers.

12. Advertising in the Star Tribune and the St. Paul Pioneer Press allows advertisers to reach a broad cross-section of consumers in the Minneapolis/St. Paul metropolitan area with a detailed message in a timely manner. A substantial portion of the defendants' advertisers do not consider other types of advertising, such as advertising in weekly newspapers, on radio, on television, or on the Internet as adequate substitutes for advertising in a local daily newspaper. In the Minneapolis/St. Paul metropolitan area, the Star Tribune and the St. Paul Pioneer Press provide advertisers the best vehicle to advertise the price of their goods or services in a timely manner. If the merged firm were to impose a small but significant and nontransitory increase in the price of advertising in local daily newspapers, it would lose too few sales to make the price increase unprofitable.

13. Accordingly, the sale of local daily newspapers to readers and the sale of access to those readers to advertisers in those newspapers each constitutes a line of commerce, or a relevant product market, within the meaning of Section 7 of the Clayton Act.

### B. Geographic Market

14. The Star Tribune and the St. Paul Pioneer Press are both produced, published, and distributed in the Minneapolis/St. Paul metropolitan area.

15. The Star Tribune and the St. Paul Pioneer Press target readers in the Minneapolis/St. Paul metropolitan area. Both papers provide news relating to the Minneapolis/St. Paul metropolitan area in addition to state and national news. Together, the Star Tribune and the St. Paul Pioneer Press generate approximately 80 percent of their total circulation from the Minneapolis/St. Paul metropolitan area.

16. Local daily newspapers that serve areas outside of the Minneapolis/St. Paul metropolitan area do not provide local news specific to the Minneapolis/St. Paul metropolitan area. From a reader's standpoint, local daily newspapers serving areas outside of the Minneapolis/St. Paul metropolitan area are not acceptable substitutes for the Star Tribune and the St. Paul Pioneer Press. If the merged firm were to impose a small but significant and nontransitory increase in the price of local daily newspapers serving the Minneapolis/St. Paul metropolitan area, it would lose too few sales to make the price increase unprofitable.

17. The Star Tribune and the St. Paul Pioneer Press allow advertisers to target readers in the Minneapolis/St. Paul metropolitan area. From the standpoint of an advertiser selling goods or services in the Minneapolis/St. Paul metropolitan area, advertising in local daily newspapers serving areas outside of the Minneapolis/St. Paul metropolitan area is not an acceptable substitute for advertising in the Star Tribune and the St. Paul Pioneer Press. If the merged firm were to impose a small but significant and nontransitory increase in the price of advertisements in local daily newspapers service the Minneapolis/St. Paul metropolitan area, it would lose too few sales to make the price increase unprofitable.

18. Accordingly, the Minneapolis/St. Paul metropolitan area in the state of Minnesota is a section of the country, or a relevant geographic market, within the meaning of Section 7 of the Clayton Act.

## IV. Competitive Effects

### A. Harm to Readers

19. The Star Tribune and the St. Paul Pioneer Press are each other's primary competitor in the sale of local daily newspaper in the Minneapolis/St. Paul metropolitan area, competing aggressively for readers. Their head-to-head competition has given readers in the Minneapolis/St. Paul metropolitan area higher quality news coverage, better service, and lower prices. A combination of these two newspapers under common ownership and control would substantially reduce or eliminate that competition and would decrease incentives of the merged firm to maintain high levels of quality and service.

20. The proposed merger would give the newly merged entity almost 100 percent of local daily newspaper circulation in the Minneapolis/St. Paul metropolitan area. Based on audited figures for daily circulation ending March 2004, the Star Tribune had a daily circulation of 296,069 or approximately 64 percent of readers, and the St. Paul Pioneer Press had a daily circulation of 159,223, or approximately 34 percent of readers, in the Minneapolis/St. Paul metropolitan area. Based on audited figures for Sunday circulation ending March 2004, the Star Tribune had a Sunday circulation of 517,685, or approximately 72 percent of readers, and the St. Paul Pioneer Press had a daily circulation of 203,471, or approximately 28 percent of readers, in the Minneapolis/St. Paul metropolitan area.

21. The only other local daily newspaper competitor of the merged firm in the Minneapolis/St. Paul metropolitan area is the Stillwater Gazette with a daily circulation (excluding Sunday) of 3,255 in the year ending in March 2004, which represents less than one percent of readers.

22. Using a measure of market concentration called the Herfindahl-Hirschman Index ("HHI"), explained in Appendix A, the combination of the Star Tribune and the St. Paul Pioneer Press under common ownership and control would create a monopoly and yield a post-merger HHI of approximately 9,900, representing an increase of roughly 4,488 points for daily circulation. For Sunday circulation, the combination of the Star Tribune and the St. Paul Pioneer Press would yield an HHI of approximately 10,000, an increase of roughly 4,050 points.

### B. Harm to Advertisers

23. The Star Tribune and the St. Paul Pioneer Press are each other's primary competitor in the sale of advertising in local daily newspapers in the Minneapolis/St. Paul metropolitan area, competing aggressively for the business of advertisers in that area. Their head-to-head competition has been

instrumental in giving advertisers in the Minneapolis/St. Paul metropolitan area higher quality advertising, better service, and lower prices. A combination of these two newspapers under common ownership and control would substantially reduce or eliminate that competition.

24. If the two papers combine under common ownership and control, the combined entity would control virtually 100 percent of the sales of advertisements in local daily newspapers serving the Minneapolis/St. Paul metropolitan area. In 2005, the Star Tribune generated $308 million, or approximately 68 percent, in total daily newspaper advertising revenues. The St. Paul Pioneer Press generated $140 million, or approximately 32 percent, in total daily newspaper advertising revenues. The vast majority of these advertising revenues come from advertisers seeking to reach readers in the Minneapolis/St. Paul metropolitan area.

### V. Entry

25. Entry by local daily newspapers in the Minneapolis/St. Paul metropolitan area is time-consuming and difficult, and is not likely to eliminate the anticompetitive effects of the merger by constraining the market power of the combined entity in the near-term, or in the foreseeable future. Local daily newspapers incur significant fixed costs, many of which are sunk. Examples of these sunk costs include hiring reporters and editors, news gathering, and marketing the very existence of the new paper, all of which take substantial time. In the event that the entrant fails or exits the newspaper industry, it cannot recover these sunk costs, making entry risky and likely unprofitable. As a result, entry will not be timely, likely, or sufficient to eliminate the competitive harm that would likely result from the proposed merger.

### VI. Violation Alleged

26. On March 12, 2006, McClatchy, and Knight-Ridder entered into the Merger Agreement. Pursuant to that agreement, Knight-Ridder would merge with and into McClatchy. As a result of this transaction, the Star Tribune and the St. Paul Pioneer Press would be under common ownership and control.

27. This transaction will have the following effects, among others, in violation of Section 7 of the Clayton Act, 15 U.S.C. 18:

(a) Competition in the sale of local daily newspapers to readers in the Minneapolis/St. Paul metropolitan area will be substantially lessened or eliminated;

(b) Prices for local daily newspapers in the Minneapolis/St. Paul metropolitan area would likely increase to levels above those that would prevail absent the merger;

(c) Competition in the sale of advertising in local daily newspapers in the Minneapolis/St. Paul metropolitan area will be substantially lessened or eliminated; and

(d) Prices for advertising in local daily newspapers in the Minneapolis/St. Paul metropolitan area would likely increase to levels above those that would prevail absent the merger.

### VII. Requested Relief

28. Plaintiff requests:

(a) Adjudication that the proposed merger of McClatchy and Knight-Ridder violates Section 7 of the Clayton Act;

(b) Permanent injunctive relief to prevent the consummation of the proposed merger and to prevent the defendants from entering into or carrying out any agreement, understanding or plan, the effect of which would be to combine the businesses or assets of defendants;

(c) An award to plaintiff of its costs in this action; and

(d) Such other relief as is proper.

Dated: June 27, 2006.

For Plaintiff United States of America.

Thomas O. Barnett,
*Assistant Attorney General, Antitrust Division.*

David L. Meyer,
*Deputy Assistant Attorney General, Antitrust Division.*

J. Robert Kramer II,
*Director of Operations.*

John R. Read,
*Chief, Litigation III.*

Gregg I. Malawer (D.C. Bar #481685),
Joan Hogan,
*Attorneys for the United States, United States Department of Justice, Antitrust Division, Litigation III, 325 7th Street, NW., Suite 300, Washington, DC 20530, (202) 514–2000.*

### Exhibit A—Definition of HHI and Calculations for Market

"HHI" means the Herfindahl-Hirschman Index, a commonly accepted measure of market concentration. It is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers. For example, for a market consisting of four firms with shares of thirty, thirty, twenty and twenty percent, the HHI is 2600 ($30^2 + 30^2 + 20^2 + 20^2 = 2600$). The HHI takes into account the relative size and distribution of the firms in a market and approaches zero when a market consists of a large number of firms of relatively equal size. The HHI increases both as the number of firms in the market decreases and as the disparity in size between those firms increases.

Markets in which the HHI is between 1000 and 1800 points are considered to be moderately concentrated, and those in which the HHI is in excess of 1800 points are considered to be concentrated. Transactions that increase the HHI by more than 100 points in concentrated markets presumptively raise antitrust concerns under the Merger Guidelines. See Merger Guidelines § 1.51.

### Proposed Final Judgment

*Whereas,* Plaintiff, United States of America, and defendants, The McClatchy Company ("McClatchy"), and Knight Ridder, Incorporated ("Knight Ridder"), by their respective attorneys, have consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law, and without this Final Judgment constituting any evidence against or admission by any party regarding any issue of fact or law;

*And whereas,* Defendants agree to be bound by the provisions of this Final Judgment pending its approval by the Court;

*And whereas,* the essence of this Final Judgment is the prompt and certain divestiture of certain rights or assets by the Defendant McClatchy to assure that competition is not substantially lessened;

*And whereas,* Plaintiff requires Defendant McClatchy to make certain divestitures for the purpose of remedying the loss of competition alleged in the Complaint;

*And whereas,* Defendant McClatchy has represented to the United States that the divestitures required below can and will be made and that Defendant McClatchy will later raise no claim of hardship or difficulty as grounds for asking the Court to modify any of the divestiture provisions contained below;

*Now, therefore,* before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the parties, it is *ordered, adjudged, and decreed:*

### I. Jurisdiction

This Court has jurisdiction over the subject matter of and each of the parties to this action. The Complaint states a claim upon which relief may be granted against defendant under Section 7 of the Clayton Act, as amended (15 U.S.C. 18).

### II. Definitions

As used in this Final Judgment:

A. *"McClatchy"* means Defendant The McClatchy Company, a Delaware corporation with its headquarters in Sacramento, California, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

B. *"Knight Ridder"* means Defendant Knight Ridder, Inc., a Florida corporation with its headquarters in San Jose, California, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

C. *"Pioneer Press"* or *"St. Paul Pioneer Press"* means the local daily newspaper referred to as either the Pioneer Press or the St. Paul Pioneer Press, distributed in the Minneapolis/St. Paul metropolitan area, and owned and operated by defendant McClatchy.

D. *"Star Tribune"* means the local daily newspaper, distributed in the Minneapolis/St. Paul metropolitan area, and owned and operated by defendant McClatchy.

E. *"Minneapolis/St. Paul metropolitan area"* means the area encompassing and surrounding the cities of Minneapolis and St. Paul in the state of Minnesota.

F. *"Divestiture Assets"* means all of the assets, tangible or intangible, used in the operations of the Pioneer Press, including, but not limited to:

1. All tangible assets that comprise the printing, publication, distribution, sale, and operation of the Pioneer Press, including all equipment, fixed assets and fixtures, personal property, inventory, office furniture, materials, supplies, and other tangible

**41252**  Federal Register / Vol. 71, No. 139 / Thursday, July 20, 2006 / Notices

property and all assets used in connection with the Pioneer Press; all licenses, permits and authorizations issued by any governmental organization relating to the Pioneer Press; all contracts, agreements, leases, commitments, certifications, and understandings relating to the Pioneer Press, including supply agreements; all customer lists, contracts, accounts, and credit records; all repair and performance records and all other records relating to the Pioneer Press;

2. All intangible assets used in the printing, publication, distribution, production, servicing, sale and operation of the Divestiture Assets, including, but not limited to all licenses and sublicenses, intellectual property, technical information, computer software (except defendant's proprietary software) and related documentation, know-how, drawings, blueprints, designs, specifications for materials, specifications for parts and devices, quality assurance and control procedures, all technical manuals and information defendant provide to their own employees, customers, suppliers, agents or licensees, and all research data relating to the Pioneer Press.

G. *"Acquirer"* or *"Acquirers"* mean the entity or entities to whom Defendant McClatchy divest the Divestiture Assets.

### III. Applicability

A. This Final Judgment applies to McClatchy and Knight Ridder, as defined above, and all other persons in active concert or participation with any of them who receive actual notice of this Final Judgment by personal service or otherwise.

B. Defendant McClatchy shall require, as a condition of the sale or other disposition of all or substantially all of their assets or of lesser business units that include the Divestiture Assets, that the purchaser(s) agree(s) to be bound by the provisions of this Final Judgment.

### IV. Divestitures

A. Defendant McClatchy is ordered and directed to divest the Divestiture Assets in a manner consistent with this Final Judgment to an Acquirer or Acquirers acceptable to the United States in its sole discretion, before the later of (1) sixty (60) calendar days after the filing of the Complaint in this matter or (2) five (5) days after notice of the entry of this Final Judgment by the Court. The United States, in its sole discretion, may agree to one or more extensions of this time, not to exceed sixty (60) calendar days in total, and shall notify the Court in such circumstances. Defendant McClatchy agrees to use its best effort to divest the Divestiture Assets, and to obtain all regulatory approvals necessary for such divestitures, as expeditiously as possible.

B. In accomplishing the divestiture ordered by this Final Judgment, Defendant McClatchy promptly shall make known, by usual and customary means, the availability of the Divestiture Assets. Defendant McClatchy shall inform any person making inquiry regarding a possible purchase of the Divestiture Assets that they are being divested pursuant to this Final Judgment and provide that person with a copy of this Final Judgment. Defendant McClatchy shall offer to furnish to all prospective Acquirers, subject to customary confidentiality assurances, all information and documents relating to the Divestiture Assets customarily provided in a due diligence process, except such information or documents subject to the attorney-client or work product privileges. Defendant McClatchy shall make available such information to the United States at the same time that such information is made available to any other person.

C. Defendant McClatchy shall provide to the Acquirer(s) and the United States information relating to the personnel involved in the operation of the Divestiture Assets to enable the Acquirer(s) to make offers of employment. Defendant McClatchy will not interfere with any negotiations by the Acquirer(s) to employ an employee of Defendant McClatchy whose primary responsibility relates to the operation of the Divestiture Assets.

D. Defendant McClatchy shall permit prospective Acquirers of the Divestiture Assets to have reasonable access to personnel and to make inspections of the physical facilities of any and all facilities relating the operation of the Pioneer Press; access to any and all environmental, zoning, and other permit documents and information; and access to any and all financial, operational or other documents and information customarily provided as part of a due diligence process.

E. Defendant McClatchy shall warrant to the Acquirer(s) of the Divestiture Assets that the assets will be operational on the date of sale.

F. Defendant McClatchy shall not take any action that will impede in any way the permitting, operation, or divestiture of the Divestiture Assets.

G. Defendant McClatchy shall warrant to the Acquirer(s) of the Divestiture Assets that there are no material defects in the environmental, zoning or other permits pertaining to the operation of the Assets, and that following the sale of the Divestiture Assets, Defendant McClatchy will not undertake, directly or indirectly, any challenges to the environmental, zoning or other permits relating to the operation of the Divestiture Assets.

H. Unless the United States otherwise consents in writing, the divestiture pursuant to Section IV, or by trustee appointed pursuant to Section V, of this Final Judgment, shall include the entire Divestiture Assets, and shall be accomplished in such a way as to satisfy the United States, in its sole discretion, that the Divestiture Assets can and will be used by the Acquirer(s) as part of a viable, ongoing newspaper publishing business. Divestiture of the Divestiture Assets may be made to one or more Acquirers, provided that in each instance it is demonstrated to the sole satisfaction of the United States that the Divestiture Assets will remain viable and the divestiture of such assets will remedy the competitive harm alleged in the Complaint. The divestiture, whether pursuant to Section IV or V of this Final Judgment:

1. Shall be made to an Acquirer or Acquirers that, in the United State's sole judgment, has the intent and capability (including the necessary managerial, operational, and financial capability) of competing effectively in the sale of local daily newspapers to readers and in the sale of advertising in such newspapers in the Minneapolis/St. Paul metropolitan areas; and

2. Shall be accomplished so as to satisfy the United States, in its sole discretion, that none of the terms of any agreement(s) between an Acquirer or Acquirers and defendant McClatchy give Defendant McClatchy the ability unreasonably to raise the Acquirer's costs, to lower to Acquirer's efficiency, or otherwise to interfere in the ability of the Acquirer to compete effectively.

### V. Appointment of Trustee

A. If Defendant McClatchy has not divested the Divestiture Assets within the time period specified in Section IV(A), Defendant McClatchy shall notify the United States of that fact in writing. Upon application of the United States, the Court shall appoint a trustee selected by the United States and approved by the Court to effect the divestiture of the Divestiture Assets.

B. After the appointment of a trustee becomes effective, only the trustee shall have the right to sell the Divestiture Assets. The trustees shall have the power and authority to accomplish the divestiture to an Acquirer(s) acceptable to the United States at such price and on such terms as are then obtainable upon reasonable effort by the trustee, subject to the provisions of Sections IV, V and VI of this Final Judgment, and shall have such other powers as this Court deems appropriate. Subjects to Section V(D) of this Final Judgment, the trustee may hire at the cost and expense of Defendant McClatchy any investment bankers, attorneys, or other agents, who shall be solely accountable to the trustee, reasonably in the trustee's judgement to assist in the divestiture.

C. Defendant McClatchy shall not object to a sale by the trustee on any ground other than the trustee's malfeasance. Any such objections by Defendant McClatchy must be conveyed in writing to the United States and the trustee within ten (10) calendar days after the trustee has provided the notice required under Section VI.

D. The trustee shall serve at the cost and expense of defendant McClatchy, on such terms and conditions as the United States approves, and shall account for all monies derived from the sale of the assets sold by the trustee and all costs and expenses so incurred. After approval by the Court of the trustee's accounting, including fees for its services and those of any professionals and agents retained by the trustee, all remaining money shall be paid to Defendant McClatchy and the trust shall then be terminated. The compensation of the trustee and any professionals and agents retained by the trustee shall be reasonable in light of the value of the Divestiture Assets and based on a fee arrangement providing the trustee with an incentive based on the price and terms of the divestiture and the speed with which it is accomplished, but timeliness is paramount.

E. Defendant McClatchy shall use its best efforts to assist the trustee in accomplishing

the required divestiture. The trustee and any consultants, accountants, attorneys, and other persons retained by the trustee shall have full and complete access to the personnel, books, records, and facilities related to the operation of the Pioneer Press and Defendant McClatchy shall develop financial and other information relevant to the operation of the Pioneer Press as the trustee may reasonably request, subject to reasonable protection for trade secret or other confidential research, development, or commercial information. Defendant McClatchy shall take no action to interfere with or to impede the trustee's accomplishment of the divestiture.

F. After its appointment becomes effective, the trustee shall file monthly reports with the United States and the Court, setting forth the trustee's efforts to accomplish the divestiture ordered under this Final Judgment. To the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court. Such reports shall include the name, address, and telephone number of each person who, during the preceding month, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or make an inquiry about acquiring, any interest in the Divestiture Assets, and shall describe in detail each contact with any such person. The trustee shall maintain full records of all efforts made to divest the Divestiture Assets.

G. If the trustee has not accomplish such divestiture within four (4) months after its appointment, the trustee shall promptly file with the Court a report setting forth: (1) The trustee's efforts to accomplish the required divestiture, (2) the reasons, in the trustee's judgment, why the required divestiture has not been accomplished, and (3) the trustee's recommendations. To the extent such reports contain information that the trustee deems confidential, such report shall not be filed in the public docket of the Court. The trustee at the same time shall furnish such report to the United States, who shall have the right to make additional recommendations consistent with the purpose of the trust. The Court thereafter shall enter such orders as it shall deem appropriate to carry out the purpose of this Final Judgment, which may, if necessary, include extending the trust and the term of the trustee's appointment by a period requested by the United States.

### VI. Notice of Proposed Divestiture

A. Within two (2) business days following execution of a definitive divestiture agreement, Defendant McClatchy or the trustee, whichever is then responsible for effecting the divestiture required herein, shall notify the United States of any proposed divestiture required by Section IV or V of this Final Judgment. If the trustee is responsible, it shall similarly notify Defendant McClatchy. The notice shall set forth the details of the proposed divestiture and list the name, address, and telephone number of each person not previously identified who offered or expressed an interest in or desire to acquire any ownership interest in the Divestiture Assets, together with full details of the same.

B. Within fifteen (15) calendar days of receipt by the United States of such notice, the United States may request from Defendant McClatchy, the proposed Acquirer(s), any other third party, or the trustee if applicable additional information concerning the proposed divestiture, the proposed Acquirer(s) and any other potential Acquirer(s). Defendant McClatchy and the trustee shall furnish any additional information requested within fifteen (15) calendar days of the receipt of the request, unless the parties shall otherwise agree.

C. Within thirty (30) calendar days after receipt of the notice or within twenty (20) calendar days after the United States has been provided the additional information requested from Defendant McClatchy, the proposed Acquirer(s), any third party and the trustee, whichever is later, the United States shall provide written notice to Defendant McClatchy and the trustee, if there is one, stating whether or not it objects to the proposed divestiture. If the United States provides written notices that it does not object, the divestiture may be consummated, subject only to Defendant McClatchy's limited right to object to the sale under Section V(C) of this Final Judgment. Absent written notice that the United States does not object to the proposed Acquirer(s) or upon objection by the United States, a divestiture proposed under Section IV or V shall not be consummated. Upon objection by Defendant McClatchy under Section V(C), a divestiture proposed under Section V shall not be consummated unless approved by the Court.

### VII. Financing

Defendant McClatchy shall not finance all or any part of any purchase made pursuant to this Final Judgment.

### VIII. Hold Separate Order

Until the divestitures required by the Final Judgment have been accomplished, Defendant McClatchy shall take all steps necessary to comply with the Hold Separate Stipulation and Order entered by this Court and to preserve in all material respects the Divestiture Assets. Defendant McClatchy shall take no action that would jeopardize the divestiture of the Divestiture Assets.

### IX. Affidavits

A. Within twenty (20) calendar days of the filing of the Complaint and every thirty (30) calendar days thereafter until the divestiture has been completed, whether pursuant to Section IV or V of this Final Judgment, Defendant McClatchy shall deliver to the United States an affidavit as to the fact and manner of their compliance with Section IV or V of this Final Judgment. Each such affidavit shall include the name, address, and telephone number of each person who, during the preceding thirty (30) days, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divestiture Assets and shall describe in detail each contact with any such person during that period. Each such affidavit shall also include a description of the efforts that defendant McClatchy has taken to solicit buyers for the Divestiture Assets and to provide required information to prospective purchasers, including the limitations, if any, on such information. Assuming the information set forth in the affidavit is true and complete, any objection by the United States to information provided by Defendant McClatchy, including limitations on information, shall be made within fourteen (14) days of receipt of such affidavit.

B. Within twenty (20) calendar days of the filing of the Complaint in this matter, Defendant McClatchy shall deliver to the United States an affidavit that describes in reasonable detail all actions Defendant McClatchy has taken and all steps Defendant McClatchy has implemented on an ongoing basis to comply with Section IV of this Final Judgment. Defendant McClatchy shall deliver to the United States an affidavit describing any changes to the efforts and actions outlined in Defendant McClatchy's earlier affidavits filed pursuant to this section within fifteen (15) calendar days after the change is implemented.

C. Defendant McClatchy shall keep all records of all efforts made to preserve and divest the Divestiture Assets until one year after such divestiture has been completed.

### X. Compliance Inspection

A. For the purposes of determining or securing compliance with this Final Judgment, or of determining whether the Final Judgment should be modified or vacated, and subject to any legally recognized privilege, from time to time duly authorized representatives of the United States Department of Justice, including consultants and other persons retained by the United States, shall, upon the written request of a duly authorized representative of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to Defendant McClatchy, be permitted:

1. Access during defendant McClatchy's office hours to inspect and copy or, at plaintiff's option, to require defendant McClatchy to provide copies of, all books, ledgers, accounts, records and documents in the possession, custody, or control of the defendant McClatchy, relating to any matters contained in this Final Judgment; and

2. To interview, either informally or on the record, defendant McClatchy's officers, employees, or agents, who may have their individual counsel present, regarding such matters. The interviews shall be subject to the interviewee's reasonable convenience and without restraint or interference by Defendant McClatchy.

B. Upon the written request of a duly authorized representative of the Assistant Attorney General in charge of the Antitrust Division, Defendant McClatchy shall submit such written reports or responses to written interrogatories, under oath if requested, relating to any of the matters contained in this Final Judgment as may be requested.

C. No information or documents obtained by the means provided in this section shall be divulged by the United States to any person other than an authorized representative of the Executive Branch of the United States, except in the course of legal proceedings to which the United States is a party (including grand jury proceedings), or

for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

D. If, at the time Defendant McClatchy furnishes information or documents to the United States, Defendant McClatchy represents and identifies in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(7) of the Federal Rules of Civil Procedure, and Defendant McClatchy marks each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(7) of the Federal Rules of Civil Procedure," then the United States shall give defendant McClatchy ten (10) calendar days' notice prior to divulging such material in any legal proceeding (other than a grand jury proceeding).

### XI. No Reacquisition

During the term of this Final Judgment, Defendant McClatchy may not reacquire any part of the Divestiture Assets.

### XII. Retention of Jurisdiction

This Court retains jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

### XIII. Expiration of Final Judgment

Unless this Court grants an extension, this Final Judgment shall expire (10) ten years from the date of its entry.

### XIV. Public Interest Determination

For the reasons set forth in the Competitive Impact Statement filed in this case, and made available for public comment, entry of this Final Judgment is in the public interest and the parties have complied with the procedures of the Antitrust Procedures and Penalties Act, 15 U.S.C. 16.

Court Approval Subject to Procedures of Antitrust Procedures and Penalties Act, 15 U.S.C. 16.

Dated:

_____
United States District Judge

### Competitive Impact Statemnt

Plaintiff, the United States of America ("United States" or "Plaintiff" or "government"), pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act ("APPA"), 15 U.S.C. 16(b)–(h), files this Competitive Impact Statement relating to the proposed Final Judgment submitted for entry in this civil antitrust proceeding.

### I. Nature and Purpose of the Proceeding

Plaintiff the United States filed a civil antitrust Complaint on June 26, 2006, alleging that a proposed merger of The McClatchy Company ("McClatchy") and Knight-Ridder, Incorporated ("Knight-Ridder") would violate Section 7 of the Clayton Act, 15 U.S.C. 18. The Complaint alleges that McClatchy and Knight-Ridder are each other's primary competitor in the sale of local daily newspapers to readers in the Minneapolis/St. Paul metropolitan area in the state of Minnesota and in the sale of advertising in such newspapers. The merger would combine under common ownership and control the only two local daily newspapers serving the Minneapolis/St. Paul metropolitan area in the state of Minnesota and in the sale of advertising in such newspapers. The merger would combine under common ownership and control the only two local daily newspapers serving the Minneapolis/St. Paul metropolitan area, the Star Tribune and the St. Paul Pioneer Press. The newly merged firm would have essentially a 100 percent market share (by circulation and revenue). As a result, the combination of these two daily newspapers would substantially reduce or eliminate competition for readers of local daily newspapers and newspaper readers in the Minneapolis/St. Paul metropolitan area would be likely to pay higher prices and to receive lower levels of quality and service. In addition, the combination of these two daily newspapers in the Minneapolis/St. Paul metropolitan area and advertisers would be likely to pay higher prices and to receive lower levels of quality and service for their advertisements.

The prayer for relief seeks: (a) An adjudication that the proposed merger described in the Complaint would violate Section 7 of the Clayton Act; (b) permanent injunctive relief preventing the consummation of the transaction; (c) an award to the plaintiff of the costs of this action; and (d) such other relief as is proper.

Shortly before this suit was filed, a proposed settlement was reached that permits McClatchy to complete its merger with Knight-Ridder, yet preserves competition in the markets in which the transaction would raise significant competitive concerns. A Stipulation and proposed Final Judgment embodying the settlement were filed at the same time the Complaint was filed.

The proposed Final Judgment, which is explained more fully below, requires McClatchy and Knight-Ridder to divest the St. Paul Pioneer Press to acquirer(s) acceptable to the United States. Unless the United States grants a time extension, the divestiture must be completed within sixty (60) calendar days after the filing of the Complaint in this matter or five (5) calender days after notice of the entry of this Final Judgment by the Court, whichever is later.

If the divestitures are not completed within the divestiture period, the Court, upon application of the United States, is to appoint trustee selected by the United States to sell the assets. The proposed Final Judgment also requires that, until the divestitures mandated by the Final Judgment have been accomplished, the defendants must maintain and operate the St. Paul Pioneer Press as an active competitor, maintain the management, staffing, sales, and marketing of St. Pioneer Pioneer Press and fully maintain the St. Paul Pioneer Press in operable condition.

The plaintiff and the defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA. Entry of the proposed Final Judgment would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof.

### II. The Alleged Violation

#### A. The Defendants

McClatchy is a Delaware corporation with its headquarters in Sacramento, California.

McClatchy publishes twelve (12) daily newspapers throughout the United States. In the Minneapolis/St. Paul metropolitan area, McClatchy owns and operates the Star Tribune. McClatchy had revenues of approximately $1.2 billion during 2005.

Knight-Ridder is a Florida corporation with its headquarters in San Jose, California. Knight-Ridder publishes thirty-two (32) daily newspapers throughout the United States. In the Minneapolis/St. Paul metropolitan area, Knight-Ridder owns and operates the St. Paul Pioneer Press. Knight-Ridder had revenues of approximately $3 billion during 2005.

#### B. Description of the Events Giving Rise to the Alleged Violation

On March 12, 2006, McClatchy and Knight-Ridder entered into an "Agreement and Plan of Merger between The McClatchy Company and Knight-Ridder, Inc." ("Merger Agreement"). Pursuant to that agreement, (1) Knight-Ridder would merge with and into McClatchy; (2) Knight-Ridder would cease to exist as a separate corporate entity; and (3) McClatchy would continue to operate as the sole surviving company. As consideration for the merger, each share of Knight-Ridder common stock would be exchanged for cash and stock, for an aggregate transaction value in excess of $4 billion.

The Star Tribune and the St. Paul Pioneer Press compete head-to-head in the sale of local daily newspapers in the Minneapolis/St. Paul metropolitan area and compete head-to-head in the sale of advertising in these local daily newspapers. They compete for readers so that they can better compete for advertisers. The proposed merger, and the threatened loss of competition that would be caused by it, precipitated the government's suit.

#### C. Anticompetitive Consequences of the Proposed Transaction

1. Relevant Market

*A. Product Market.* The Complaint alleges that the sale of local daily newspapers to readers and the sale of access to those readers to advertisers in such newspapers each constitutes a line of commerce within the meaning of Section 7 of the Clayton Act. From a reader's standpoint, the news stories in local daily newspapers, such as the Star Tribune and the St. Paul Pioneer Press, differ significantly from other sources of news. The news stories are detailed, as compared to the news as reported by radio or television, and the Star Tribune and the St. Paul Pioneer Press cover a wide range of stories of interest to local readers, not just major news highlights. Newspapers, such as the Star Tribune and the St. Paul Pioneer Press, are portable and allow the reader to read the news, advertisements, and other information at his or her own convenience. Readers also value other features of the Star Tribune and

the St. Paul Pioneer Press, such as calendars of local events and meetings, movie and TV listings, classified advertisements, commercial advertisements, legal notices, comics, syndicated columns, and obituaries. Reader of the Star Tribune and the St. Paul Pioneer Press do not consider weekly newspapers, radio news, television news, or Internet news to be adequate substitutes for local daily newspapers. If the merged firm were to impose a small but significant and nontransitory increase in the price of advertisements in local daily newspapers, it would lose too few sales to make the price increase unprofitable.

From an advertiser's standpoint, there is no alternative to purchasing advertisements from local daily papers. Advertising in the Star Tribune and the St. Paul Pioneer Press allows advertisers to reach a broad cross-section of consumers in the Minneapolis/St. Paul metropolitan area with a detailed message in a timely manner. A substantial portion of defendants' advertisers do not consider other types of advertising, such as advertising in weekly newspapers, on radio, on television, or on the Internet as adequate substitutes for advertising in a local daily newspaper. In the Minneapolis/St. Paul metropolitan area, the Star Tribune and the St. Paul Pioneer Press provide advertisers the best vehicle to advertise the price of their goods or services in a timely manner. If the merged firm were to impose a small but significant and nontransitory increase in the price of advertising in local daily newspapers, it would lose too few sales to make the price increase unprofitable.

B. Geographic Market. The Complaint alleges that the Minneapolis/St. Paul metropolitan area in the state of Minnesota is a section of the country, or a relevant geographic market, within the meaning of Section 7 of the Clayton Act. The Star Tribune and the St. Paul Pioneer Press are both produced, published, and distributed in the Minneapolis/St. Paul metropolitan area. The Star Tribune and the St. Paul Pioneer Press target readers in the Minneapolis/St. Paul metropolitan area. Both papers provide news relating to the Minneapolis/St. Paul metropolitan area in addition to state and national news. Together, the Star Tribune and the St. Paul Pioneer Press generate approximately 80 percent of their total circulation from the Minneapolis/St. Paul metropolitan area.

Local daily newspapers that serve areas outside of the Minneapolis/St. Paul metropolitan area do not provide local news specific to the Minneapolis/St. Paul metropolitan area. From a readers's standpoint, local daily newspapers serving areas outside of the Minneapolis/St. Paul metropolitan area are not acceptable substitutes for the Star Tribune and the St. Paul Pioneer Press. If the merged firm were to impose a small but significant and nontransitory increase in the price of local daily newspapers serving the Minneapolis/St. Paul metropolitan area, it would lose too few sales to make the price increase unprofitable.

From the standpoint of an advertiser selling goods or services in the Minneapolis/St. Paul metropolitan area, advertising in local daily newspapers serving areas outside of the Minneapolis/St. Paul metropolitan area are not acceptable substitutes for the Star Tribune and the St. Paul Pioneer Press. If the merged firm were to impose a small but significant and nontransitory increase in the price of local daily newspapers serving the Minneapolis/St. Paul metropolitan area, it would lose too few sales to make the price increase unprofitable.

2. Competitive Effects

A. Harm to Readers. The Complaint alleges that, in the Minneapolis/St. Paul metropolitan area, the merger of McClatchy and Knight-Ridder would lessen competition substantially and tend to create a monopoly in market for local daily newspapers. The Star Tribune and the St. Paul Pioneer Press are each other's primary competitor in the sale of local daily newspapers in the Minneapolis/St. Paul metropolitan area, competing aggressively for readers. Their head-to-head competition has given readers in the Minneapolis/St. Paul metropolitan area higher quality news coverage, better service, and lower prices. A combination of these two newspapers under common ownership and control would substantially reduce or eliminate that competition and would decrease incentives of the merged firm to maintain high levels of quality and service.

The proposed transaction would create further market concentration in an already concentrated market for local daily newspapers. The merged firm would control the only two daily local newspapers in the Minneapolis/St. Paul metropolitan area, the Star Tribune and the St. Paul Pioneer Press, with a market share position of almost 100 percent, as measured by local daily newspaper circulation. Prior to the merger, the Star Tribune had the highest market share in the Minneapolis/St. Paul metropolitan area, with approximately 72 percent of readers. The only other local daily newspaper competitor of the merged firm in the Minneapolis/St. Paul metropolitan area, the Stillwater Gazette, had a market share of less than one percent of readers. According to the Herfindahl-Hirschman Index ("HHI"), a widely-used measure of market concentration defined and explained in Exhibit A, the combination of the Star Tribune and the St. Paul Pioneer Press under common ownership and control would create a monopoly and yield a post-merger HHI of approximately 9,900, representing an increase of roughly 4,488 points for daily circulation. For Sunday circulation, at the combination of the Star Tribune and the St. Paul Pioneer Press would yield an HHI of approximately 10,000, an increase of roughly 4,050 points.

B. Harm to Advertisers. The Complaint also alleges that, in the Minneapolis/St. Paul metropolitan area, the merger of McClatchy and Knight would lessen competition substantially and tend to create a monopoly in the market for advertising in local daily newspapers. The Star Tribune and the St. Paul Pioneer Press are each other's primary competitor in the sale of advertising in local daily newspapers in the Minneapolis/St. Paul metropolitan area, the create a monopoly in the market for advertising local daily newspapers in the Minneapolis/St. Paul metropolitan area, competing aggressively for the business of advertisers in that area. Their head-to-head competition has been instrumental in giving advertisers in the Minneapolis/St. Paul metropolitan area higher quality advertising better service, and lower prices. A combination of these two newspapers under common ownership and control would substantially reduce or eliminate that competition.

The proposed transaction would create further market concentration in an already concentrated market for advertising in local daily newspapers. If the two papers combine under common ownership and control, the combined city would control virtually 100 percent of the sales of advertisements in local daily newspapers serving the Minneapolis/St. Paul metropolitan area. Prior to the merger, the Star Tribune generated $308 million, or approximately 68 percent, in total local daily newspaper advertising revenues. The St. Paul Pioneer Press generated $140 million, or approximately 32 percent, in total local daily newspaper advertising revenues. The vast majority of these advertising revenues come from advertisers seeking to reach readers in the Minneapolis/St. Paul metropolitan area.

The proposed Final Judgment would leave the merged firm in control of the Star Tribune, but not the St. Paul Pioneer Press. As a result readers will not be harmed as the separate owners of the Star Tribune and the St. Paul Pioneer Press will still have an economic incentive to compete against each other and capture the other company readers by offering lower prices and a better product. In addition, advertisers will not be harmed as the separate owners of the Star Tribune and the St. Paul Pioneer Press will still have an economic incentive to compete against each other for additional advertising dollars by offering lower rates, discounts off the rate cards, and better service. The proposed Final Judgment will preserve the premerger competitive situation in which readers and advertisers have two local daily newspapers in the Minneapolis/St. Paul metropolitan area from which to choose.

3. Entry

Entry by local daily newspapers in the Minneapolis/St. Paul metropolitan area is time-consuming and difficult, and is not likely to eliminate the anticompetitive effects of the merger by constraining the market power of the combined entity in the near-term, or in the foreseeable future. Local daily newspapers incur significant fixed costs, many of which are sunk. Examples of these sunk costs include hiring reporters and editors, news gathering, and marketing the very existence of the new paper, all of which take substantial time. In the event that the entrant fails or exists the newspaper industry, it cannot recover these sunk costs, making entry risky and likely unprofitable. As a result, entry will not be timely, likely, or sufficient to eliminate the competitive harm that would likely result from the proposed merger.

4. Violation Alleged

For all of these reasons, Plaintiff has concluded that the proposed transaction would lessen competition substantially in the

sale of local daily newspapers to readers and in the sale of advertising in such newspapers serving the Minneapolis/St. Paul metropolitan area, and likely result in increased prices and lower service and quality for readers and advertisers. The proposed merger therefore violates of Section 7 of the Clayton Act.

### 3. Explanation of the Proposed Final Judgment

The proposed Final Judgment would preserve existing competition in the sale of local daily newspapers to readers and in the sale of advertising in such newspapers serving the Minneapolis/St. Paul metropolitan area. It requires the divestiture of the St. Paul Pioneer Press. The divestiture will preserve choices for read less likely that in the relevant market (1) prices will increase for readers, (2) prices will increase for advertisers, (3) the quality of the local daily newspapers will decline or (4) service levels will decline as a result of the transaction.

Unless the United States grants an extension of time, the divestiture must be completed within sixty (60) calendar days after the filing of the Complaint in this matter or five (5) calender days after notice of the entry of this Final Judgment by the Court, whichever is later. Until the divestiture takes place, McClatchy must maintain and operate the St. Paul Pioneer Press as an active competitor to the Star Tribune, maintain the management, staffing, sales, and marketing of the St. Paul Pioneer Press, and fully maintain St. Paul Pioneer Press in operable condition.

The divestiture must be to a purchaser or purchasers acceptable to the United States in its sole discretion. Unless the United States otherwise consents in writing, the divestiture shall include all the assets of the St. Paul Pioneer Press, and shall be accomplished in such a way as to satisfy the United States that such assets can and will be used as a viable local daily newspaper.

If Defendant McClatchy fails to divest the St. Paul Pioneer Press within the time periods specified in the Final Judgment, the Court, upon, application of the United States, is to appoint a trustee nominated by the United States to effect the divestitures. If a trustee is appointed, the proposed Final Judgment provides that McClatchy will pay all costs and expenses of the trustee and any professionals and agents retained by the trustee. Under Section V(d) of the propose Final Judgment, the compensation paid to the trustee and any persons retained by the trustee shall be both reasonable in light of the value of the St. Paul Pioneer Press, and based on a fee arrangement providing the trustee with an incentive based on the price and terms of the divestitures and the speed with which they are accomplished. Timeliness is paramount. After appointment, the trustee will file monthly reports with the parties and the Court, setting forth the trustee's efforts to accomplish the divestitures ordered under the proposed Final Judgment. Section V(g) of the proposed Final Judgment provides that if the trustee has not accomplished the divestitures within four (4) months after its appointment, the trustee shall promptly file with the Court a report setting forth (1) the trustee's efforts to accomplish the required divestitures, (2) the reasons, in the trustee's judgment, why the required divestitures have not been accomplished and (3) the trustee's recommendations. At the same time the trustee will furnish such report to the plaintiff and defendants, who will each have the right to be heard and to make additional recommendations.

### 4. Remedies Available to Potential Private Litigants

Section 4 of the Clayton Act, 15 U.S.C. 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees. Entry of the proposed Final Judgment will neither impair nor assist the bringing of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. 16(a), the proposed Final Judgment has no prima facie effect in any subsequent private lawsuit that may be brought against defendants.

### 5. Procedures Available for Modification of the Proposed Final Judgment

Plaintiff and defendants have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that plaintiff has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least sixty (60) days preceding the effective date of the proposed Final Judgment within which any person may submit to plaintiff written comments regarding the proposed Final Judgment. Any person who wishes to comment should do so within sixty (60) days of the date of publication of this Competitive Impact Statement in the **Federal Register**. All comments received during this period will be considered by the Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time prior to the Court's entry of judgment. The comments and the response of plaintiff will be filed with the Court and published in the **Federal Register**.

Written comments should be submitted to: John R. Read, Chief, Litigation III, Antitrust Division, United States Department of JustIce, 325 7th Street, NW., Suite 300, Washington, DC 20530.

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

### 6. Alternatives to the Proposed Final Judgment

Plaintiff considered, as an alternative to the proposed Final Judgment, a full trial on the merits against Defendants. Plaintiff could have continued the litigation and sought preliminary and permanent injunctions against McClatchy's acquisition of Knight-Ridder. Plaintiff is satisfied, however, that the divestiture of assets and other relief described in the proposed Final Judgment will preserve competition in the sale of local daily newspapers to readers and in the sale of advertising in such newspapers serving the Minneapolis/St. Paul metropolitan area as identified in the Complaint.

### 7. Standard of Review Under the APPA for Proposed Final Judgment

The APPA requires that proposed consent judgments in antitrust cases by the United States be subject to a sixty (60) day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public interest." In making that determination, the Court shall consider:

(A) The competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration or relief sought, anticipated effects of alternative remedies actually considered and any other considerations bearing upon the adequacy of such judgment;

(B) The impact of entry of such judgment upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public bene t, if any, to be derived from a determination of the issues at trial.

15 U.S.C. 16(e)(l)(A) & (B). As the United states Court of Appeals for the D.C. Circuit held, this statute permits a court to consider, among other things, the relationship between the remedy secured and the specific allegations set forth in the government's complaint, whether the decree is sufficiently clear, whether enforcement mechanisms are sufficient and whether the decree may positively harm third parties. See *United States* v. *Microsoft*, S6 F.3d 1448, 1461–62 (D.C. Cir. 1995).

"Nothing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. 16(e)(2). Thus, in conducting this inquiry, "[t]he Court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process."[1] Rather,

[a]bsent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should * * * carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances.

---

[1] 119 Congo Rec. 24598 (1973) (statement of Senator Tunney). See *United States* v. *Gillette Co.*, 406 F. Supp. 713, 715 (D. Mass. 1975). A "public interest" determination can be made properly on the basis of the Competitive Impact Statement and Response to Comments filed pursuant to the APPA. Although the APPA authorizes the use of additional procedures, 15 U.S.C. § 16(f), those procedures are discretionary. A court need not invoke any of them unless it believes that the comments have raised significant issues and that further proceedings would aid the court in resolving those issues. See H.R. Rep. 93–1463, 93rd Cong. 2d Sess. 8–9 (1974), reprinted in U.S.C.C.A.N. 6535, 6538.

*United States* v. *Mid-America Dairymen. Inc.*, 977–1 Trade Cas. ¶ 61,508, at 71,980 (W.D. Mo. 1977).

Accordingly, with respect to the adequacy of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what relief would best serve the public." *United States* v. *BNS. Inc.*, 858 F.2d 456, 462 (9th Cir. 1988), citing *United States* v. *Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir.), cert. denied, 454 U.S. 11083 (1981); see also Microsoft, 56 F.3d at 1460–62. Precedent requires that:

The balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree. The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is "*within the reach of the public interest*." More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.[2]

*Bechtel*, 648 F .2d at 666 (citations omitted) (emphasis added).

Court approval of a final judgment requires a standard more flexible and less strict than the standard required for a finding of liability. "[A] proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is 'within the reaches of public interest.' " *United States* v. *American Tel. and Tel. Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982), aff'd. sub nom. *Maryland* v. *United States*, 460 U.S. 1001 (1983), quoting Gillette Co., 406 F. Supp. at 716 (citations omitted); *United States* v. *Alcan Aluminum, Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky. 1985). Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case." Microsoft, 56 F.3d at 1459. Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Id.* at 1459–60.

---

[2] Cf. BNS. 858 F.2d at 464; 858 F.2d at 64 (bolding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); Gillette, 406 F. Supp. at 716 (noting that, in this way, the court s constrained to "look at the overall picture not hypercritically, nor with a microscope, but with artist's reducing glass"); see generally Microsoft, 56 F.3d at 1461 (discussing whether 'the remedies [obtained in the decree are) so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest' ").

### VIII. Determinative Document

There are no determinative materials or documents within the meaning of the APPA that were considered by the plaintiff in formulating the proposed Final Judgment.
Dated: June 27, 2006.
Respectfully submitted,
Gregg I. Malawer (D.C. Bar #481685), U.S. Department of Justice Antitrust Division, 325 7th Street, NW., Suite 300, Washington, DC 20530, (202) 514–0230, Attorney for Plaintiff the United States.

### Exhibit A—Definition of HHI and Calculations for Market

"HHI" means the Herfindahl-Hirschm Index, a commonly accepted measure of market concentration. It is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers. For example, for a market consisting of four firms with shares of thirty, thirty, twenty and twenty percent, the HHI is 2600 ($30^2 + 30^2 + 20^2 + 20^2 = 2600$). The HHI takes into account the relative size and distribution of the firms in a market and approaches zero when a market consists of a large number of firms of relatively equal size. The HHI increases both as the number of firms in the market decreases and as the disparity in size between those firms increases.

Markets in which the HHI is between 1000 and 1800 points are considered to be moderately concentrated, and those in which the HHI is in excess of 1800 points are considered to be concentrated. Transactions that increase the HHI by more than 100 points in concentrated markets presumptively raise antitrust concerns under the Merger Guidelines. See Merger Guidelines § 1.51.

[FR Doc. 06–6362 Filed 7–19–06; 8:45 am]
**BILLING CODE 4410–11–M**

---

## DEPARTMENT OF JUSTICE

### Antitrust Division

### Notice Pursuant to the National Cooperative Research and Production Act of 1993—DVD Copy Control Association

Notice is hereby given that, on June 22, 2006, pursuant to Section 6(a) of the National Cooperative Research and Production Act of 1993, 15 U.S.C. 4301 *et seq.* ("the Act"), DVD Copy Control Association ("DVD CCA") has filed written notifications simultaneously with the Attorney General and the Federal Trade Commission disclosing changes in its membership. The notifications were filed for the purpose of extending the Act's provisions limiting the recovery of antitrust plaintiffs to actual damages under specified circumstances. Specifically, BeyondWiz Co., Ltd., Seongnam, Republic of Korea; CD Video Manufacturing, Inc., Santa Ana, CA; Hong Kong KONKA Ltd., Hong Kong, Hong Kong-China; Kawai Musical Instruments Mfg. Co., Ltd., Shizuoka, Japan; Shenzhen Mizuda AV Co., Ltd., Shenzhen, People's Republic of China; Teltron S.A.,Buenos Aires, Argentina; and Toyo Recording Co., Ltd., Tokyo, Japan have been added as parties to this venture.

Also, CIS Technology, Inc., Taipei Hsien, Taiwan; and Encentrus Systems Inc., Pointe-Claire, Quebec, Canada have withdrawn as parties to this venture. In addition, Favor Digital Technology Co., Ltd. has changed its name to Major Digital Technology Co., Ltd., Jiang Xi, People's Republic of China.

No other changes have been made to either the membership or planned activity of the group research project. Membership in this group research project remains open, and DVD CCA intends to file additional written notification disclosing all changes in membership.

On April 11, 2001, DVD CCA filed its original notification pursuant to Section 6(a) of the Act. The Department of Justice published a notice in the **Federal Register** pursuant to Section 6(b) of the Act on August 3, 2001 (66 FR 40727).

The last notification was filed with the Department on March 16, 2006. A notice was published in the **Federal Register** pursuant to Section 6(b) of the Act on April 12, 2006 (71 FR 18769).

**Dorothy B. Fountain,**
*Deputy Director of Operations, Antitrust Division.*
[FR Doc. 06–6359 Filed 7–19–06; 8:45 am]
**BILLING CODE 4410–11–M**

---

## DEPARTMENT OF JUSTICE

### Antitrust Division

### Notice Pursuant to the National Cooperative Research and Production Act of 1993—Network Centric Operations Industry Consortium, Inc.

Notice is hereby given that, on June 20, 2006, pursuant to Section 6(a) of the National Cooperative Research and Production Act of 1993, 15 U.S.C. 4301 *et seq.* ("Act"), Network Centric Operations Industry Consortium, Inc. has filed written notifications simultaneously with the Attorney General and the Federal Trade Commission disclosing changes in its membership. The notifications were filed for the purpose of extending the Act's provisions limiting the recovery of antitrust plaintiffs to actual damages under specified circumstances. Specifically, American Red Cross, Washington, DC; Open Geospatial